Chad S. Caby, Wyo. Bar No. 7-5457
LEWIS ROCA ROTHGERBER CHRISTIE LLP
1601 19th Street, Suite 1000
Denver, CO  80202
Tel:     303.628-9583
Fax:     303.623.9222
Email: ccaby@lewisroca.com

*Attorneys for Plaintiff*
*Auchea Business Solutions*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| AUCHEA BUSINESS SOLUTIONS LLC, a Delaware limited liability company, <br><br> Plaintiff, <br><br> v. <br><br> INSPIRE GROUP LLC, a Wyoming limited liability company, INSPIRE GROUP NV LLC, a Nevada limited liability company, DUANE TOUGH, and BRENT RUTTMAN, <br><br> Defendants. | Civil Case No. _____ |

## VERIFIED COMPLAINT AND JURY DEMAND

Plaintiff Auchea Business Solutions LLC ("Plaintiff" or "ABS") by and through

undersigned counsel, files this Complaint and Jury Demand and in support thereof states:

## NATURE OF THE ACTION

1.     ABS is a financial technology company that facilitates transaction processing

services for its clients. ABS's mission is to offer customers technical support for accounts payable

and provide at least the same security as standard bank transactions with higher quality service at a lower cost.

2.      This action involves a fraudulent bait and switch scheme by sophisticated parties who conspired to induce ABS, its affiliates, and its clients to deposit millions of dollars into Defendants' bank account only to subsequently claim the bank account was frozen or closed while refusing to provide evidence of what had occurred with the deposits. Defendants represented these accounts would be used in furtherance of ABS's and its clients' business transactions and that Defendants had the experience and ability to manage the accounts and transactions. These representations were false and misrepresented the true nature of these accounts, Defendants' experience and capabilities, and Defendants' intentions.

3.      ABS was introduced to the Inspire Group by defendant Brent Ruttman, who held a unique position of trust within ABS as its compliance officer. During the Summer of 2024, ABS was in desperate need of an immediate banking partner. Ruttman used his position of influence and his access to ABS's sensitive and confidential business information to induce ABS to contract with the Inspire Group, a company Ruttman owned and operated with defendant Duane Tough. Pursuant to the terms of that contract, ABS directed millions of dollars to Inspire's bank accounts. Once Defendants had control of the money, they declared they lost access to the accounts and neither ABS nor its clients could withdraw funds. Despite ABS's repeated requests, Defendants have refused to provide any documentary proof that any funds remain in the accounts and have repeatedly declined to allow ABS or its counsel access to the accounts or authorization to speak with Bank of America, N.A. Defendants have offered contradictory and shifting explanations for why they cannot access the funds nor provide any evidence for the funds' whereabouts.

4.      ABS subsequently discovered that defendants Tough and Ruttman had previously been sued for very similar fraudulent misconduct. Specifically, a Nevada court, and a court-appointed receiver, determined that Tough and Ruttman absconded with millions of dollars deposited in their bank accounts by trusting business partners and clients. In addition, Tough and Ruttman destroyed evidence and repeatedly sought to hinder and delay discovery of their fraud using excuses eerily similar to those Defendants have provided to ABS.

5.      Given the nature of Defendants' prior fraudulent conduct, their blatant and brazen disregard for court orders, and their refusal to provide any evidence to ABS showing the funds remain safe, it is imperative that Defendants be immediately restrained from their ongoing fraudulent conduct and any continued dissipation of assets.

6.      As a direct and proximate result of Defendants' actions, ABS has suffered or will suffer more than $6 million in damages from the loss of the funds deposited in Defendants' accounts. ABS also faces potential liability from its clients as their funds were deposited into the Inspire Group's Bank of America account for further processing by Defendants.

7.      Due to the complexity of Defendants' fraudulent scheme, ABS, via separate motion, will seek prejudgment relief from the Court to preserve the status quo between the parties as to any funds remaining in Defendants' possession or control or in Defendants' bank accounts held by third parties. ABS will also seek leave from the Court via separate motion to perform expedited discovery (particularly in the form of serving subpoenas) to ascertain the whereabouts of its funds and prove the scope and degree of Defendants' wrongful conduct.

## PARTIES

8.      Plaintiff Auchea Business Solutions LLC ("ABS") is a limited liability company organized and existing under the laws of the State of Delaware, with a principal place of business at 115 North Main, Charleston, Missouri 63834. Its members are G&L Holding LLC, a Missouri limited liability company, and Pluvion LLC, a Florida limited liability company. G&L Holding LLC's members are the Glenn C. Ault Jr. Living Trust, a Missouri trust, and the Linda B. Ault Living Trust, a Missouri trust. The members of Pluvion LLC are Javier Goicochea, a resident of Florida, and Thompson International Ltd., Inc., of which Mr. Goicochea is the sole member. ABS's registered agent is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

9.      Defendant The Inspire Group NV, LLC ("Inspire NV") is a limited liability company organized and existing under the laws of the State of Nevada. On information and belief, its principal place of business is 930 S 4th Street, Suite 209, Las Vegas, Nevada 89101, and its sole member is defendant Brent Ruttman, a resident of Omaha, Nebraska. Inspire NV's registered agent is Republic Registered Agent LLC, 930 South 4th Street, Suite 209, Las Vegas, Nevada 89101.

10.      Defendant The Inspire Group LLC ("Inspire" and with Inspire NV, the "Inspire Group") is a limited liability company organized and existing under the laws of the State of Wyoming. On information and belief, its principal place of business is 10483 Manderson Plaza, Omaha, Nebraska 68134. On information and belief, Inspire is wholly owned by defendant Brett Ruttman as its sole member, an individual residing in Omaha, Nebraska. Inspire's registered agent is Republic Registered Agent LLC, 5380 E 2nd Street, Suite 7000, Casper, WY 82609.

11.     On information and belief, defendant Brett Ruttman ("Ruttman") is an individual residing in Omaha, Nebraska. Ruttman is a managing member of Inspire NV, the sole member and owner of Inspire, and a "primary consultant" of Inspire.

12.     On information and belief, defendant Duane Tough ("Tough") is an individual residing in Las Vegas, Nevada. On information and belief, Tough is an agent and "primary consultant" for Inspire and a partner in the business, with authority to direct and control Ruttman with respect to Inspire's business dealings. On information and belief, Tough purports to be associated with Inspire NV.

## JURISDICTION, VENUE, AND CHOICE OF LAW

13.     This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between ABS and Defendants and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

14.     Venue for this Complaint is proper in this Court because the dispute arises, in part, out of a contract, a true and correct copy of which is attached as **Exhibit A**, which includes a forum selection clause in favor of Wyoming that states: the Agreement shall be interpreted and construed in accordance with the laws of the State of Wyoming and venue for any dispute will be Wyoming. (Exhibit A § 6.1.)

15.     Venue is also proper in this district pursuant to 28 U.S.C. § 1391(b)(3) because it is the judicial district in which one or more of the defendants reside.

## FACTUAL ALLEGATIONS

16.     ABS is a financial technology (fintech) company that provides domestic and international transaction processing services in U.S. dollars to its clients. ABS's clients are

primarily located outside the United States. One of the important ways ABS provides value for its clients is by offering a high level of security for the clients' transactions and money.

17.    To provide these services, ABS maintains accounts with banks in the United States. These accounts are often structured as FBO accounts, meaning the account is held in ABS's name while the funds are held for benefit of ABS's underlying clients. ABS's clients entrust their money to ABS with the understanding that ABS will act either as their agent or administrator of the account, facilitating the electronic transmission of instructions to the bank holding ABS's underlying client's funds.

18.    ABS is affiliated with two other companies, Business Services International ("BSI") and G&J Business Solutions LLC ("G&J"). All three entities have the same ultimate beneficial owners and utilize the same licensed technology to provide client services. The owners of BSI and G&J set up ABS as a new entity in early 2024 and were in the process of transitioning clients from BSI to ABS during the events described in this Complaint.

19.    Relevant to this action, BSI had accounts with Byline Bank ("Byline") in early 2024. Byline is a mid-size bank headquartered in Chicago, Illinois and a subsidiary of Byline Bancorp, Inc. ABS utilized BSI's Byline accounts to conduct business while transitioning clients and establishing its own bank accounts.

20.    In or around the first week of April 2024, Byline requested detailed information on all ABS's clients. Banks that offer accounts to fintech payment platforms typically have robust compliance departments to handle the complexities and legal requirements associated with servicing such clients and are under regulatory pressure to diligently oversee such account relationships. Due to the high-risk nature of fintech payment platforms, banks routinely request

detailed information for compliance purposes and often terminate banking relationships with fintech payment platforms, a process known as "derisking." Given its industry experience, ABS suspected that Byline's request for information meant Byline would soon be closing BSI's accounts, which would have forced ABS to quickly find a new banking partner.

**DEFENDANTS FRAUDULENTLY INDUCE ABS TO CONTRACT WITH INSPIRE**

21.     Following Byline's March 2024 request for information, ABS began to seek a new banking partner. ABS's management directed Teresa Skawski, ABS's Chief Technology Officer (CTO), to work with defendant Brent Ruttman ("Ruttman") on identifying potential banks.

22.     At the time of the events in this Complaint, ABS and its affiliates had employed Ruttman for over six years as a 1099 independent contractor. Ruttman held the fiduciary position of ABS's Compliance Officer for Bank Services. In this role, Ruttman advised ABS and its affiliates on banking compliance issues, corresponded directly with bank compliance departments on their behalf, and prepared compliance documents for submission to banks.

23.     When Ms. Skawski turned to Ruttman for leads on a new banking partner, she was not aware of Inspire's existence or Ruttman's affiliation with the Inspire Group or Tough. Ms. Skawski asked Ruttman to assist solely in his capacity as ABS's compliance officer.

24.     On or about June 6, 2024, Byline gave ABS 90-days' notice that ABS would have to move its accounts from Byline to a new bank by September 4, 2024. On information and belief, Byline's compliance department was too small to handle the complex compliance issues associated with ABS's foreign clients and international transactions.

25.     In conversations and meetings between Ruttman and ABS, beginning in or around March 2024, Ruttman told ABS that he and his partner, Tough, could find ABS a new bank for a

fee. Over the ensuing months, and particularly between June and August 2024, Ruttman and Tough represented to ABS that Tough had strong relationships with big banks and decades of experience in the industry. However, ABS considered Defendants' proposed fee too high. Ruttman then proposed that he and Tough find ABS a new bank and that Ruttman and Tough would handle the transaction processing through their entity, Inspire Group LLC. Ruttman proposed a fee structure for this arrangement.

26.     Eventually, Ruttman offered that he and Tough could find ABS a new bank, handle transaction processing for ABS's clients, and open a master account for ABS as well as 16 subaccounts for ABS's largest clients at this new bank. Ruttman's offer of subaccounts was very attractive to ABS as it would allow ABS's clients to send and receive wire transfers in their own names, which was a major concern of ABS's clients and had been difficult for ABS to establish with other banks. Ruttman, in his position as ABS's compliance officer, knew how important these accounts were to ABS and its clients. Ruttman had worked closely with Ms. Skawski and ABS in trying to obtain such accounts from other banks. Although ABS had difficulty opening such accounts in the past, ABS relied on Defendants' representation that Tough had the banking contacts and industry experience to provide the promised accounts.

27.     Further, Ruttman represented to ABS that the new banking partner would be Bank of America ("BofA"). This was also material to ABS entering into a contract with Inspire as ABS seeks large banks with robust compliance departments that can handle the requirements associated with ABS's international clients. Again, Ruttman knew that this representation would induce ABS to enter a contract based on his experience as ABS's compliance officer and understanding of ABS's unique banking needs.

28.     ABS leveraged its good relationship with Byline to extend the September 4 deadline an additional month to find a new bank. However, in or around mid-August 2024, Byline's compliance department decided not to extend the deadline. At this point, ABS still had not identified a new bank for its accounts. The impending September 4 deadline put ABS in a precarious position. ABS would be forced to cease all business operations if it did not find a new banking partner by the September 4 deadline.

29.     Ruttman, well-aware of ABS's vulnerability and the September 4 deadline, exploited his knowledge of and access to ABS's confidential and sensitive business information to continue to push Defendants' services. ABS, with little time and no other options, ultimately agreed to engage Inspire. The parties entered into three agreements on or about August 19, 2024, to memorialize the relationship: (i) a professional services agreement; (ii) a fee agreement; and (iii) the Inspire Group LLC's general business terms and conditions agreement (collectively, the "Agreement"). True and correct copies of the professional services agreement and fee agreement are attached as **Exhibit A**. A true and correct copy of the Inspire Group LLC's general business terms and conditions agreement is attached as **Exhibit B**.

30.     The Agreement provides that Inspire will open an account for ABS with BofA, as well as subaccounts for 16 of ABS's clients. (Exhibit A, 8.) Further, Inspire will provide services for ABS and its clients, including, but not limited to:

      a.  Establishing non-exclusive relationships with USA FI's for FBO, Commercial and settlor accounts. (*Id.*)

      b.  Supplying at a minimum a payout line item ledger on the receivers Financial Statements – So that the company name requested is the company name presented on the receivers statement of transaction. (*Id.*)

c. Completing international Inbound and Outbound FI services via ACH, Swift, USA Fed Wire and other methods that may be available and required by ABS. (*Id.*)

d. Providing updates and status reports via email/phone at a minimum weekly. (*Id.*)

31.    The Agreement also provides "other covenants to the engagement," including, but not limited to:

a. The expectation is to have a working model ready to engage for production within 60 days. (*Id.*)

b. The FEE as listed below is for one Corporate account – for each additional Corporate Entity a fee of US $25,000.00 will apply to each one paid in advance. (*Id.*)

32.    Ruttman represented to ABS at or around the August 19, 2024, signing of the Agreement that Defendants had approval to open an account with BofA for ABS, as well as subaccounts for ABS's clients. Defendants' ability to provide these accounts was central and material to ABS's decision to enter the Agreement. Ruttman's representations include, but are not limited to:

a. In a July 24, 2024, email from Ruttman to Ms. Skawski, Ruttman stated: "It seems that it will not be an issue to open the account. We will be able to get them up and running very soon."

b. In an August 26, 2024, email from Ruttman to Ms. Skawski, Ruttman stated: "Hope to have the account opened by first of next week if not sooner."

c. In an August 28, 2024, email from Ruttman to Ms. Skawski, Ruttman stated: "Things are progressing nicely on the [ABS] account. Should not be much longer." Ruttman attached an invoice to this email for amounts due to Inspire for setting up the subaccounts.

33.    The Agreement provides that Inspire will process transactions in one to two business days. However, ABS made clear to Ruttman during negotiations that two-day transaction processing was not acceptable, and all transactions must occur same day. Same-day transactions

are essential to ABS's clients. Ruttman orally agreed and represented that Inspire would process all transactions same day.

## DEFENDANTS MAKE FALSE PROMISES AND REPRESENTATIONS AND FAIL TO PERFORM UNDER THE AGREEMENT

34.     As stated above, ABS believed, based on Ruttman's representations and the Agreement, that Defendants had already obtained approval from BofA to open the ABS bank account and client subaccounts.

35.     Based on this understanding, ABS wired Inspire $25,000.00 to establish ABS's account, as well as $42,500.00 for the client subaccounts pursuant to the Agreement. However, Inspire failed to provide the promised accounts by September 3, 2024, the first day Inspire was to begin providing transaction services under the Agreement.

36.     Ruttman represented that ABS's promised BofA account, and four of the sixteen subaccounts, would be available by September 6, 2024. Faced with potentially ceasing all operations upon the loss of the Byline accounts on September 4, on or about August 26, 2024, Ms. Skawski, at the direction of ABS management, asked Ruttman whether ABS and its clients could deposit their funds in an Inspire BofA account on an interim basis until the Auchea account and client subaccounts were established. Although this was not ideal, Ms. Skawski and ABS management had used a similar interim solution with banks in the past. On information and belief, Ruttman, as ABS's and its affiliates' compliance officer, was also familiar and had experience with such an interim solution. On or about August 26, 2024, Ruttman, as Inspire's agent, agreed to allow ABS and its clients to deposit their funds in the Inspire BofA account, and to process ABS's transactions from the funds deposited in that account.

37.     On information and belief, Defendants used two Inspire BofA accounts as part of their scheme. On information and belief, Inspire NV was the account holder for account number XXXXXXXX5973 ("Funds Account") and Inspire was the account holder for account number XXXXXXXX2746 ("Inspire Account" and together, "Inspire Group Accounts"). On information and belief, Inspire has access and control over Inspire NV's bank accounts, including the Funds Account. On information and belief, Ruttman and Tough treat Inspire and Inspire NV as one entity and do not observe typical corporate formalities distinguishing the entities.

38.     Ruttman and ABS agreed that the Funds Account would be used for ABS's and its clients' funds ("ABS Funds") and Ruttman instructed ABS and its clients to deposit their money in the Funds Account. Ruttman instructed ABS to wire fee payments due to Inspire under the Agreement to the Inspire Account. On information and belief, Defendants used the Inspire Account for Inspire's own funds.

39.     Pursuant to the August 26 oral agreement between Defendants and ABS to utilize the Funds Account, on September 3, 2024, Ruttman instructed ABS and its clients to wire funds to the Funds Account by first contacting Tough or Ruttman or emailing support@itspaid.global. ABS and its clients began wiring funds to the Funds Account on or about September 4, 2024.

40.     In or around the second week of October 2024, ABS discovered that Defendants were processing transactions for ABS using the Inspire Account in addition to the Funds Account. On information and belief, Defendants transferred ABS Funds from the Funds Account to the Inspire Account. Defendants did not inform ABS, nor did ABS authorize Defendants to transfer ABS Funds from the Funds Account to the Inspire Account or commingle the ABS Funds with other moneys in the Inspire Account.

41.    Ruttman represented that he was the only individual with access to the Funds Account. Although Ms. Skawski offered as early as September 2024 to assist Ruttman with bookkeeping if he would provide ABS access to the Funds Account, Ruttman repeatedly declined to allow any ABS representative access or direct visibility into the Funds Account.

42.    To monitor the accounts and transactions, Ruttman provided ABS access to an online system called "ItsPaid" offered through ItsPAID.global. ItsPAID.global is not an independent third party. On information and belief, Inspire owns and operates ItsPAID.global and the ItsPaid system.

43.    On information and belief, ItsPaid receives no direct information from BofA. On information and belief, Ruttman personally enters deposits and outgoing payments into ItsPaid, and therefore, controls all information that is provided and available to ABS. Ruttman further represented that the ItsPaid system reflected transactions and balances in the Funds Account. However, ABS had no means of independently verifying this information. ABS was wholly reliant on its trust and confidence in Ruttman.

44.    Defendants failed to establish the BofA accounts for ABS and its clients by September 6, 2024. Ruttman again represented to ABS that the accounts would be available soon, and in the interim they should continue to use the Funds Account pursuant to the oral agreement. Without a viable alternative, ABS continued to direct ABS Funds into the Funds Account.

45.    By the third week of September 2024, Defendants still had not delivered the promised BofA accounts. Throughout September and October, Ruttman continued to represent to ABS that the accounts would be available soon. However, as the weeks progressed and ABS's clients' demands for the subaccounts grew, Ruttman turned blame for the delay back on ABS. For

example, Ruttman told Ms. Skawski by telephone in or around the middle of September 2024 that ABS's clients had sent non-compliant deposits to the Funds Account, triggering review by BofA's compliance department. Ruttman represented that the compliance department's review would further delay Defendants' opening the subaccounts. In response, Ms. Skawski and her team at ABS conducted an internal compliance review of ABS's customers' deposits to the Funds Account and found no evidence to support Ruttman's claims.

46.     ABS and its clients continued to deposit funds in the Funds Account per the oral agreement through September and October. Among these deposits, G&J, ABS's affiliate, deposited $1,000,000.00 on October 11, and $1,923,849.98 on October 15, for a total of $2,923,849.98 into the Funds Account. G&J, a Missouri limited liability company, assigned its rights under, and claims arising from, its deposits totaling $2,923.849.98 into the Funds Account to ABS.

47.     While ABS was able to conduct some business through Inspire in September and October, Inspire proved incapable of meeting the standards of performance promised in the Agreement, generating negative consequences on ABS's business, reputation, and relationships with its clients. Inspire was not able to process same-day transactions as Ruttman promised. In fact, on many days, no transactions were processed at all. On information and belief, Ruttman was the only individual processing transactions for Inspire. On days he was not available, no transactions were processed. Even when available, Ruttman was not capable of handling the workload associated with ABS's business needs.

48.    October 31, 2024, was the final day that ABS and its clients were able to process transactions through the Funds Account. As of that date, $4,245,401.22 in ABS Funds were in the Funds Account according to ItsPaid and ABS's records.

**DEFENDANTS CLAIM ACCOUNT FROZEN, WITHOUT EVIDENCE**

49.    On November 4, 2024, Ruttman informed Ms. Skawski by telephone that the Inspire Account was frozen—*i.e.*, temporarily suspended or restricted. Ruttman told Ms. Skawski that BofA compliance was investigating the Funds Account after questions arose about deposits to the account. Ruttman said it would take six weeks from November 4, 2024, for the bank to complete its investigation and the Funds Account would be frozen during the pendency of the investigation. Ruttman provided no documentation or other evidence of communications to or from BofA substantiating his claim that the Inspire Account was frozen.

50.    ABS had no independent means of determining whether the funds were still in the Funds Account or if Defendants had transferred or otherwise depleted the funds without ABS's knowledge. Beginning in September, Ruttman had provided some BofA transaction statements to ABS allowing them to confirm the information Ruttman entered into the ItsPaid system accurately reflected the funds in the Funds Account. However, on or around October 21, Ruttman abruptly stopped providing these records, claiming it was too much work for him to do so. Therefore, ABS could no longer confirm whether Ruttman's representations regarding the amount of funds available in the Funds Account were accurate for at least two weeks prior to the "freeze."

51.    Raising ABS's suspicions about the "freeze," Ruttman had told ABS that he was at a conference for the week immediately preceding the freeze. During this time, Ruttman stopped

processing ABS's clients' payment requests and failed to update the ItsPaid system with any information reflecting transactions and the balance of the Funds Account.

52.    On November 8, 2024, ABS's outside legal counsel, Justin Guilder, sent a letter to BofA demanding immediate action regarding all accounts owned or controlled by Inspire or Inspire NV, including Inspire NV's account XXXXXXXX5973, and Inspire's account XXXXXXXX2746. Mr. Guilder noted that ABS had at least a balance of $4,245,401.22 in the Inspire Account as of November 8. Mr. Guilder demanded an immediate freeze of the accounts to prevent unauthorized withdrawals or fraudulent activities, and transaction records for the accounts, including the preceding six months' account statements, records of all deposits, withdrawals and transfers, and documentation of any flagged or suspicious activities.

53.    Following Mr. Guilder's November 8 letter, representatives of BofA's legal department contacted Mr. Guilder by email to set up a telephonic conference call. BofA informed Mr. Guilder that they would not provide information on the accounts in question without authorization from the account holder, Ruttman.

54.    Ms. Skawski and other ABS representatives repeatedly asked Ruttman for access to—or information from— the accounts. Ruttman declined. Ruttman also declined to authorize BofA to speak with ABS representatives regarding the status of the accounts, as requested in Mr. Guilder's November 8 letter. Ruttman offered varying excuses when ABS requested authorization to speak with BofA. Initially, during a telephone call between Mr. Goicochea and Ruttman on or about November 7, 2024, Ruttman said that he could not approve such a request because his legal counsel was traveling and unavailable. Mr. Goicochea called Ruttman by telephone again on or about November 11, 2024, to discuss the BofA authorization and Ruttman said he was sick and

therefore could not authorize the request. On November 12, 2024, Ruttman told Mr. Goicochea in a telephone call that he would speak soon with his counsel regarding the request. On November 14, 2024, Ruttman again spoke with Mr. Goicochea by phone and told Mr. Goicochea that Ruttman's legal counsel would speak with Mr. Goicochea the following week. Mr. Goicochea did not receive the promised phone call from Ruttman's counsel the following week.

55.    In addition to his other excuses, Ruttman professed that he could not authorize ABS to speak with BofA because there were other companies or individuals in the Funds Account besides ABS. Prior to November 2024, Ruttman told Ms. Skawski there were other "companies" in the account. Following the account freeze, but prior to Mr. Guilder's November 8 letter, Ruttman told Mr. Goicochea that there were a couple other "individuals" in the account. On information and belief, soon after the November 8 letter, Ruttman told Ms. Skawski that ABS was the only one in the account. Ms. Skawski raised Ruttman's conflicting explanations in a telephone call on or about November 11, 2024, and suggested that if non-ABS clients' funds were in the Funds Account, perhaps it was not an ABS client deposit that triggered the compliance review. Ruttman, again undermining his prior statements, told Ms. Skawski that it had to be an ABS client's deposit because ABS was the only one using the Funds Account. Ruttman continued to decline to authorize BofA to speak with ABS.

56.    On a November 19, 2024, telephone call between Mr. Goicochea, Ruttman, and other ABS representatives, Ruttman told Mr. Goicochea that Defendants had not received any communication from BofA regarding the status of its investigation or the Funds Account.

57.    On a November 25, 2024, telephone call between Ruttman, Tough, Defendants' counsel, Mr. Goicochea, Glen Ault, and ABS's counsel, ABS again requested information

regarding the status of the Funds Account and authorization to speak with BofA. Defendants again blamed ABS and its clients for the BofA compliance issues without evidence. Defendants represented that Tough would resolve the compliance issues through his relationships with BofA. Defendants also stated BofA sent them a letter on or about November 6 informing them the Funds Account had been closed. This was the first time Defendants admitted receiving any communication or information from BofA since November 4 and the information conflicted with their repeated representation that the account had been "frozen." Defendants agreed to provide this letter to ABS.

58.     During the November 25 telephone call, Ruttman and Tough also represented that, as of November 25, ABS's and ABS's clients' funds in Defendants' BofA accounts totaled approximately $6.4 million. ABS requested documentation or other evidence supporting Defendants' claim that the $6.4 million remained in the BofA accounts. Defendants represented they would immediately send documents and evidence showing the $6.4 million remained in the BofA accounts, including transaction records, in addition to the November 6 account closure letter. Defendants also agreed to authorize BofA to speak with and provide information to ABS regarding the status of the BofA accounts and the $6.4 million. However, Defendants attempted to dissuade ABS from speaking with BofA, claiming it would further jeopardize and delay release of any funds.

59.     In addition, on the November 25 telephone call, Defendants told ABS that BofA would send Inspire a cashier's check in Inspire's name for the balance of funds in the Funds Account as of the closure. Defendants said that upon receiving the cashier's check, they would deposit it in any account ABS requested.

60.     Following the November 25 telephone call, Ruttman sent a copy of the November 6 BofA account closure letter to Mr. Goicochea by email. However, Defendants failed to provide any additional information or documentation, including the transaction records promised during the November 25 call.

61.     On November 26, 2024, ABS's counsel sent a letter by email to Defendants' counsel and Defendants demanding Defendants provide the promised documentation and requesting authorization for ABS to speak with BofA regarding the Funds Account. The email also attached an authorization form for Defendants to sign. Defendants' counsel responded by email, stating: "you can expect to receive a reply from Duane & Brent in the next 48 hours concerning the matters below and additional matters pertaining to Inspire's relationship and contracts with ABS. Will forward once received." Despite this representation, Defendants did not return the signed authorization form, provide documentation, or any substantive response in the next 48 hours. As of the filing of this Complaint, Defendants have not provided any documentation (other than the November 6 BofA closure letter) or the signed authorization form.

62.     On November 26, 2024, Ruttman sent ABS a letter stating his resignation as ABS's compliance officer, effective immediately. Defendants sent ABS a separate letter on November 26 stating ABS's access to the Inspire Group portal (ItsPAID.Global) had been suspended for all ABS users pending further review.

**ABS DISCOVERED RUTTMAN'S AND TOUGH'S PRIOR MISCONDUCT**

63.     Following Ruttman's claim on November 4 that BofA "froze" the Funds Account, and given the numerous misrepresentations, conflicting explanations, and refusal to provide any support for Defendants' claims regarding the Funds Account, ABS started investigating Ruttman

and discovered that he and Tough were defendants in an ongoing lawsuit in Nevada. In that case, the court and a court-appointed receiver found that Ruttman and Tough had committed serious misconduct and fraud, eerily similar to the conduct at issue in this case.

64.    In April 2022, Tough and Ruttman were named as defendants in a verified complaint filed in the District Court of Clark County, Nevada ("Nevada Lawsuit"). Tough's and Ruttman's Nevada limited liability companies, Zippy Cash LLC and Tough Money LLC, were also named as defendants.

65.    Key allegations in the Nevada Lawsuit include lack of capitalization and misrepresentation, misappropriation and control of funds, destruction of records and obstruction, and breach of fiduciary duty in a similar scheme to the instant case. A true and correct copy of the verified complaint filed in the Nevada Lawsuit is attached as **Exhibit C**.

66.    Plaintiffs in the Nevada Lawsuit ("Nevada Plaintiffs") alleged in their verified complaint that Tough and Ruttman were engaged in the industry of payment processing. While seeking a payment service broker, Nevada Plaintiffs were introduced to Tough and Ruttman. Tough's and Ruttman's company, Zippy Cash, maintained bank accounts with BofA. The Nevada Plaintiffs entered a contract whereby Tough's and Ruttman's company would facilitate payments for Nevada Plaintiffs through their BofA accounts in exchange for an upfront lump fee and various fees and commissions to be paid related to any payment services provided.

67.    Tough and Ruttman suggested to Nevada Plaintiffs that they jointly create a new payment processing and e-wallet business. Tough and Ruttman represented that they had the knowledge, experience, and banking relationships necessary to develop an e-wallet solution and

secure the necessary licenses and approvals. Nevada Plaintiffs, with Tough and Ruttman, formed Zippy Cash for the purpose of creating a payment solution for a niche market.

68. During development of Zippy Cash, Tough facilitated funding through an existing BofA account Tough controlled. Tough represented that Zippy Cash would utilize his BofA account only until the necessary compliance for Zippy Cash could be completed. Tough amassed over $2.4 million in his BofA account through this scheme.

69. Tough made numerous false representations that payments to clients would be directed out of his BofA account. Nevada Plaintiffs made repeated requests for payments and verification of the amounts held in the BofA account. The Nevada Plaintiffs were reassured by Ruttman that they were working on getting the information and payments but that they were delayed due to the process of switching bookkeeping systems and that information and funds would be forthcoming shortly.

70. Shortly thereafter, Tough declared that Zippy Cash had no revenue, $2 million in debt, and may dissolve. Tough failed to release the $2.4 million reserves in his BofA account despite requests from Nevada Plaintiffs.

71. Nevada Plaintiffs then served Tough and Ruttman with a notice of termination for material breach, a demand for preservation of documents and ESI, and a demand for payment in excess of $8.1 million. Tough's and Ruttman's immediate response was to delete and destroy documents and ESI.

72. On July 27, 2022, the *Zippy* court ordered the appointment of a receiver. Not even one month after appointment, on August 15, 2022, the receiver motioned the *Zippy* court with an

- 21 -

order to show cause, discussing his grave concerns about the transactions and actions of Tough and Ruttman.

73.    At the hearing on the motion, the receiver testified to Tough's and Ruttman's wide-ranging fraudulent and deceptive practices. The court adopted the receiver's findings and testimony and issued an order finding Tough and Ruttman in contempt. A true and correct copy of the court's order is attached as **Exhibit D**.

74.    Alarmingly similar to the facts of this case, the *Zippy* court found the following:

    a.  Tough and Ruttman made "false and misleading" representations to the court and to the receiver "concerning the existence of Zippy Cash assets protected in a 'reserve' account at Bank of America which contained approximately $2.4 million in Zippy Cash funds[,]" when in fact no such account existed. (Exhibit D ¶ 6.)

    b.  Defendant Tough represented to the court and receiver that he had not taken any funds from Zippy Cash, specifically stating, "[a]t no time have I ever taken any money from Zippy Cash, paid myself a dividend or distribution from Zippy Cash, or had Zippy Cash pay any amounts on my behalf." The court found "[t]hese representations were false and misleading as Defendant Tough has withdrawn over $4.2 million from Zippy Cash accounts and deposited such funds into his personal accounts located at Bank of America." (*Id.* ¶ 7.)

    c.  Tough also represented to the court and receiver that he did not use Zippy Cash funds to purchase a penthouse condominium in Miami Beach, Florida, specifically declaring, "[a]t no time did I ever use any funds from Zippy Cash

to purchase the apartment or to finance the purchase of the apartment. Any claim that Zippy Cash's assets were used to purchase the apartment are [sic] simply false." The court again found "[t]hese representations were false and misleading as Defendant Tough transferred approximately $2.1 million of funds he took from Zippy Cash into a escrow accounts [sic] . . . established for Defendant Tough's purchase of the Miami Condo[,]" and "the Miami Condo was purchased exclusively with Zippy Cash assets." (*Id.* ¶ 8.)

75.    Ultimately, the court granted the receiver's motion ordering Tough to turn over assets to be sold by the receiver and the case was settled out of court.

76.    The findings in the Nevada Lawsuit show a pattern and practice of misconduct that aligns with Defendants' current actions and statements towards ABS. In both the Nevada Lawsuit and here, Defendants enticed third parties to deposit funds in BofA accounts Defendants controlled. In both, Defendants refused to allow others access to or visibility into those accounts. In both, Defendants made excuses to delay providing any documentation or evidence supporting their claims that the funds in the accounts had not been transferred or depleted.

77.    Based on Defendants' similar prior misconduct and Defendants refusal and failure to provide any evidence regarding the status of the funds in the Funds Account, on information and belief, Defendants have transferred or otherwise depleted ABS's funds without ABS's knowledge or authorization.

## COUNT I
### Fraud (Against all Defendants)

78.    ABS reasserts the allegations in the preceding paragraphs as though fully set forth here.

- 23 -

79.    Defendants made false representations of material facts, including, but not limited to:

a.  Defendants had received authorization from BofA to open a bank account for ABS;

b.  Defendants had received authorization from BofA to open 16 subaccounts for ABS's clients;

c.  Defendants had the ability and would perform same-day transactions services for ABS and its clients;

d.  Defendants would enter accurate information into the ItsPAID system reflecting all transactions and balances for the Funds Account;

e.  Defendants intended to assist ABS with its clients' financial transactions;

f.  Defendants would safeguard any monies ABS and its clients deposited in Defendants' BofA accounts, and would not transfer or otherwise deplete the funds without ABS's prior authorization;

g.  Defendants would keep all funds in the Funds Account and would not transfer ABS or client funds from the Funds Account without prior authorization;

h.  Defendants would not commingle ABS or client funds with non-ABS or non-client funds;

i.  ABS and its clients were the only parties depositing money in the Funds Account;

j.  BofA had temporarily suspended or "frozen" the Funds Account when in fact BofA had closed the account on November 6, 2024;

k. Defendants would provide authorization for BofA to speak with ABS concerning the Funds Account;

l. Defendants would provide documentation or other evidence showing ABS's and its clients' funds remained in the Funds Account after November 4, 2024.

80. Defendants knew that the representations were false when they made them or were at least aware that they did not have a basis for making the statements.

81. Defendants' conduct was willful and wanton.

82. Defendants intended that ABS rely on the representations.

83. ABS reasonably believed Defendants' representations were true.

84. ABS suffered damages relying on Defendants' false representations, including, but not limited to, over $5 million in economic damages.

## COUNT II
### Fraudulent Inducement (Against all Defendants)

85. ABS reasserts the allegations in the preceding paragraphs as though fully set forth here.

86. Defendants intentionally and fraudulently induced ABS to enter the Agreement, resulting in, among other things: ABS and its clients losing access to their money in the Funds Account; ABS losing clients for failure to provide same-day transactions services; ABS losing clients for failing to safeguard client funds; ABS's loss of ability to conduct any business; and harm to ABS's business reputation.

87. Defendants' intentional, deceptive, and fraudulent actions include, but are not limited to:

a.  Representing that Defendants had the ability and experience to handle ABS's business needs, including transactions services for clients outside the United States;

b.  Representing Defendants had received authorization to open a BofA bank account for Auchea;

c.  Representing Defendants had received authorization to open 16 BofA subaccounts for ABS's clients;

d.  Representing Defendants had the ability and would perform same-day transactions services for ABS and its clients;

e.  Representing Defendants would enter accurate information into the ItsPAID system reflecting all transactions and balances for the Funds Account;

f.  Representing Defendants would safeguard any monies ABS and its clients deposited in Defendants' BofA accounts, and would not transfer or otherwise deplete the funds without ABS's prior authorization;

g.  Representing Defendants would keep all funds in the Funds Account and would not transfer ABS or client funds from the Funds Account without prior authorization;

h.  Representing Defendants would not commingle ABS or client funds with non-ABS or non-client funds;

i.  Representing ABS and its clients were the only parties depositing money in the Funds Account;

j.  Transferring ABS's and clients' funds from the Funds Account to other bank accounts, including the Inspire Account, without prior authorization or approval;

k.  Falsely promising account documents reflecting the whereabouts of ABS's and clients' money;

l.  Falsely promising authorization for ABS to speak with BofA regarding the Funds Account and the whereabouts of ABS's and clients' money;

m.  Representing the Funds Account was temporarily suspended or "frozen" when in fact the account was closed.

88.  Throughout the entirety of the events in this Complaint, Defendants deflected the blame to others, including ABS, with the intention of concealing the truth of the matter, including fostering the impression that ABS and its clients were responsible for the banking compliance issues, the suspension of the accounts, and loss of access to the funds.

89.  Based on the complexity of Defendants' scheme, ABS reasonably believed Defendants' representations were true and the information he provided was legitimate.

90.  Reasonably relying on the information Defendants provided, ABS acted upon the matter by depositing and directing its clients to deposit money into Defendants' bank account and maintaining the funds in that account for approximately three months and has lost millions of dollars as a result, client business, and its valuable reputation in the marketplace, among other damages.

91.  ABS would not have entered into the Agreement had Ruttman and Defendants provided accurate and truthful information.

92.    Defendants' actions were intentional, with knowledge of the falsity, and were willful and wanton.

## COUNT III
### Negligent Misrepresentation (in the Alternative) (Against all Defendants)

93.    ABS reasserts the allegations in the preceding paragraphs as though fully set forth here.

94.    Defendants, by and through their agent, Ruttman, negligently made representations to ABS to induce ABS into entering into the Agreement and deposit significant amounts of funds into the Inspire Account, including but not limited to the following representations:

   a. Representing that Defendants had the ability and experience to handle ABS's business needs, including transactions services for clients outside the United States;

   b. Representing Defendants had received authorization to open a BofA bank account for Auchea;

   c. Representing Defendants had received authorization to open 16 BofA subaccounts for ABS's clients;

   d. Representing Defendants had the ability and would perform same-day transactions services for ABS and its clients;

   e. Representing Defendants would enter accurate information into the ItsPAID system reflecting all transactions and balances for the Funds Account;

   f. Representing Defendants would safeguard any monies ABS and its clients deposited in Defendants' BofA accounts, and would not transfer or otherwise deplete the funds without ABS's prior authorization;

g.  Representing Defendants would keep all funds in the Funds Account and would not transfer ABS or client funds from the Funds Account without prior authorization;

h.  Representing Defendants would not commingle ABS or client funds with non-ABS or non-client funds;

i.  Representing ABS and its clients were the only parties depositing money in the Funds Account;

j.  Transferring ABS's and clients' funds from the Funds Account to other bank accounts, including the Inspire Account, without prior authorization or approval;

k.  Falsely promising account documents reflecting the whereabouts of ABS's and clients' money;

l.  Falsely promising authorization for ABS to speak with BofA regarding the Funds Account and the whereabouts of ABS's and clients' money;

m.  Representing the Funds Account was temporarily suspended or "frozen" when in fact the account was closed.

n.  Defendants otherwise made false representations.

95.  Defendants actions were willful and wanton.

96.  ABS justifiably and reasonably relied on these representations in entering the Agreement and entrusting Defendants with significant amounts of funds and assets.

97.  As a result of Defendants and and/or omissions to act as listed above, ABS suffered damages, including, but not limited to, over $5 million in economic damages.

### COUNT IV
**Conversion (Against all Defendants)**

98.     ABS reasserts the allegations in the preceding paragraphs as though fully set forth here.

99.     ABS had legal title to and the right to possess the assets.

100.     Defendants have wrongly converted the funds and other assets belonging to ABS, including the Funds wired to and deposited in bank accounts held by Inspire, interfering with ABS's right to use and possess the property.

101.     ABS demanded that Defendants return the funds.

102.     Defendants refuse to relinquish control and return ABS property and assets and have deprived ABS its rightful possession of the same.

103.     As a result of Defendants' conversion of ABS property, ABS has been damaged in an amount in excess of $5 million.

### COUNT V
**Civil Conspiracy (Against all Defendants)**

104.     ABS reasserts the allegations in the preceding paragraphs as though fully set forth here.

105.     Defendants set out to wrongfully convert and misappropriate ABS's funds and assets.

106.     Defendants discussed and planned the wrongful action before ABS entered into the Agreement.

107.    Defendants agreed that Inspire would enter the Agreement, inducing ABS and its clients to deposit money into Defendants' bank account, and then transfer and otherwise deplete ABS's assets, thereby accomplishing Defendants' goal of wrongfully converting the ABS assets.

108.    Defendants illegally transferred assets from ABS and its clients to themselves.

109.    Defendants, by and through their agents, Ruttman and Tough, made negligent and fraudulent misrepresentations to ABS, including, but not limited to:

a.  Representing that Defendants had the ability and experience to handle ABS's business needs, including transactions services for clients outside the United States;

b.  Representing Defendants had received authorization to open a BofA bank account for Auchea;

c.  Representing Defendants had received authorization to open 16 BofA subaccounts for ABS's clients;

d.  Representing Defendants had the ability and would perform same-day transactions services for ABS and its clients;

e.  Representing Defendants would enter accurate information into the ItsPAID system reflecting all transactions and balances for the Funds Account;

f.  Representing Defendants would safeguard any monies ABS and its clients deposited in Defendants' BofA accounts, and would not transfer or otherwise deplete the funds without ABS's prior authorization;

g. Representing Defendants would keep all funds in the Funds Account and would not transfer ABS or client funds from the Funds Account without prior authorization;

h. Representing Defendants would not commingle ABS or client funds with non-ABS or non-client funds;

i. Representing ABS and its clients were the only parties depositing money in the Funds Account;

j. Transferring ABS's and clients' funds from the Funds Account to other bank accounts, including the Inspire Account, without prior authorization or approval;

k. Falsely promising account documents reflecting the whereabouts of ABS's and clients' money;

l. Falsely promising authorization for ABS to speak with BofA regarding the Funds Account and the whereabouts of ABS's and clients' money;

m. Representing the Funds Account was temporarily suspended or "frozen" when in fact the account was closed.

110. All of Defendants acted in concert to effectively steal ABS's assets.

111. As a result of the conspiracy between all the Defendants, ABS suffered damages in an amount in excess of $5 million.

**COUNT VI**
**Negligence (Against all Defendants)**

112. ABS reasserts the allegations in the preceding paragraphs as though fully set forth here.

113.    In executing their duties under the Agreement, Defendants owed ABS a duty to use reasonable care in possessing and controlling ABS's funds and assets and in executing ABS and its clients' monetary transactions.

114.    Defendants breached their duty of reasonable care by grossly mismanaging ABS's and its clients' funds and transactions.

115.    Defendants' failure to exercise reasonable care resulted in damages to ABS in the form of lost profits and revenues and the loss of over $5 million in funds.

## COUNT VII
### Breach of Fiduciary Duty (Against Tough and Ruttman)

116.    ABS reasserts the allegations in the preceding paragraphs as though fully set forth here.

117.    Ruttman occupied a position of trust and confidence with respect to ABS in his position as ABS's compliance officer and as such owed fiduciary duties to ABS.

118.    Among the fiduciary duties Ruttman owed to ABS are the duty of loyalty and fiduciary duties with respect to ABS's confidential, proprietary and/or trade secret information.

119.    Ruttman and Tough also occupied positions of trust and confidence with respect to ABS in their roles with Inspire as agents of ABS entrusted with maintaining and safeguarding ABS's and its clients' money.

120.    Among the fiduciary duties Ruttman and Tough owed to ABS in this role are the duties of loyalty and good faith.

121.    Ruttman and Tough have breached, are breaching, and/or will breach said duties to ABS causing ABS's economic loss.

122. ABS is entitled to legal relief for Ruttman's and Tough's breaches of their fiduciary duties.

123. Ruttman's and Tough's breaches have caused ABS damages.

## COUNT VIII
### Breach of Contract (Against Inspire)

124. ABS reasserts the allegations in the preceding paragraphs as though fully set forth here.

125. ABS and Inspire expressly entered into the written Agreement.

126. The Agreement was a binding contract between Inspire and ABS.

127. Under the terms and conditions of the Agreement, Inspire made the following promises, in addition to others:

    a. Open a BofA account for ABS;

    b. Open BofA subaccounts for 16 of ABS's clients;

    c. Execute financial transactions for ABS and its clients in accordance with industry standards.

128. ABS performed all conditions precedent to Inspire's obligations under the Agreement.

129. Inspire's actions and omissions constitute a material breach of these express terms of the Agreement.

130. Inspire's breach of the Agreement caused ABS to suffer damages in excess of $5 million for which Inspire is liable.

## COUNT IX
### Breach of Oral Agreement (Against Inspire)

131.    ABS reasserts the allegations in the preceding paragraphs as though fully set forth here.

132.    On or about August 26, 2024, Ruttman, as agent for Defendants, entered into an oral agreement with ABS.

133.    The terms of this oral agreement include:

a.  ABS and its clients should deposit and/or wire funds to the Funds Account;

b.  Inspire and Defendants would hold and safeguard the funds in the Funds Account for ABS and its clients;

c.  Defendants would process payments and transactions from these funds at ABS's direction;

d.  ABS would compensate Inspire according to the fee schedule in the Agreement for these services; and

e.  Inspire would return the funds in the Funds Account to ABS and/or its clients at any time upon request.

134.    ABS performed all conditions precedent to Inspire's obligations under the oral agreement;

135.    Inspire's actions and omissions constitute material breaches of the oral agreement;

136.    Inspire's breach of the oral agreement caused ABS to suffer damages in excess of $5 million for which Inspire is liable.

## COUNT X
### Unjust Enrichment (in the Alternative) (Against Inspire Group)

137.    ABS reasserts the allegations in the preceding paragraphs as though fully set forth here.

138.    ABS provided Defendants valuable services and materials.

139.    Defendants accepted these valuable items, including but not limited to, over $5 million in monetary funds.

140.    Under the circumstances, Defendants knew that ABS would expect the return of these funds.

141.    Defendants have failed to return the funds, resulting in damages to ABS in excess of $5 million.

## COUNT XI
### Unjust Enrichment (assigned to ABS by G&J) (Against Inspire Group)

142.    ABS reasserts the allegations in the preceding paragraphs as though fully set forth here.

143.    G&J provided Inspire valuable services and materials.

144.    Inspire accepted these valuable items, including but not limited to, $2,923,849.98 in monetary funds.

145.    Under the circumstances, Inspire knew that G&J would expect the return of these funds.

146.    G&J assigned all rights and claims arising out of or in connection with the benefit conferred upon Inspire to ABS.

147.    Inspire has failed to return the funds, resulting in damages to G&J of $2,923,849.98.

## COUNT XII
### Constructive Trust (Against all Defendants)

148.    ABS reasserts the allegations in the preceding paragraphs as though fully set forth here.

149.    ABS and Defendants had a confidential or fiduciary relationship under the Agreement.

150.    Additionally, Defendant Ruttman was in a confidential or fiduciary relationship with ABS as ABS's compliance officer.

151.    Defendants promised under the terms of the Agreement to safeguard and maintain ABS's funds transferred to the Inspire Account for ABS.

152.    ABS transferred funds to Defendants based on Defendants' promises.

153.    Defendants have been unjustly enriched by their wrongful transfer or conveyance of ABS's funds resulting in the conversion of those funds to Defendants.

154.    As a result of Defendants' actions, ABS has suffered damages in excess of $5 million.

**COUNT XIII**
**Appointment of a Receiver (Against Inspire Group)**

155.    ABS reasserts the allegations in the preceding paragraphs as though fully set forth here.

156.    Defendants have absconded million of dollars of ABS's funds.

157.    Defendants have mismanaged ABS's funds such that ABS is without access to the funds, nor can it ascertain the current location of the funds.

158.    On information and belief, Defendants have or will destroy Inspire's business records and communications to hide their wrongful acts.

159.    Defendants lack any justifiable business reason for their misconduct.

160.   Plaintiff seeks the appointment of a receiver to manage the affairs of Inspire pursuant to Wyoming Statute Section 1-33-101(a)(ii) and/or 1-33-101(a)(iii) and to take all necessary action consistent with Wyoming law.

161.   Pursuant to Wyoming Statute Section 1-33-104, the receiver under control of the Court, may take possession of Inspire's property, make transfers, and generally do acts respecting the property as the Court may authorize.

162.   Defendants are guilty of fraud, conspiracy, and gross mismanagement in the conduct and control of Inspire in that they have personally converted and embezzled funds from ABS and otherwise used Inspire as a platform to steal from ABS and its clients.

163.   The assets of Inspire are in danger of waste, sacrifice or loss through Defendants' conduct.

164.   As a direct and proximate result of Defendants' ongoing breaches of duties owed to ABS and other misconduct, ABS and its clients have suffered and shall continue to suffer irreparable harm, absent the appointment of a receiver.

165.   The appointment of a receiver during the pendency of these proceedings is necessary to conserve, preserve, protect, and administer assets in which ABS has an interest.

166.   ABS requests an order pursuant to WS § 1-33-101(a)(ii) and/or 1-33-101(a)(iii) appointing a receiver to take possession and control of Inspire's business, funds, and assets, including Inspire and Inspire NV's accounts with Bank of America.

**COUNT XIV**
**Unfair or Deceptive Trade Practices (WS § 40-12-108) (Against Inspire Group)**

167.   ABS reasserts the allegations in the preceding paragraphs as though fully set forth here.

168.    Inspire, through its agents Tough and Ruttman, made false representations of material facts, including, but not limited to:

a.  Inspire had received authorization from BofA to open a bank account for ABS;

b.  Inspire had received authorization from BofA to open 16 subaccounts for ABS's clients;

c.  Inspire had the ability and would perform same-day transactions services for ABS and its clients;

d.  Inspire would enter accurate information into the ItsPAID system reflecting all transactions and balances for the Funds Account;

e.  Inspire intended to assist ABS with its clients' financial transactions;

f.  Inspire would safeguard any monies ABS and its clients deposited in Inspire BofA accounts, and would not transfer or otherwise deplete the funds without ABS's prior authorization;

g.  Inspire would keep all funds in the Funds Account and would not transfer ABS or client funds from the Funds Account without prior authorization;

h.  Inspire would not commingle ABS or client funds with non-ABS or non-client funds;

i.  ABS and its clients were the only parties depositing money in the Funds Account;

j.  BofA had temporarily suspended or "frozen" the Funds Account when in fact BofA had closed the account on November 6, 2024;

k. Inspire would provide authorization for BofA to speak with ABS concerning the Funds Account;

l. Inspire would provide documentation or other evidence showing ABS's and its clients' funds remained in the Funds Account after November 4, 2024.

169. Inspire knew that the representations were false when they made them or were at least aware that they did not have a basis for making the statements.

170. Inspire intended that ABS rely on the representations.

171. ABS reasonably believed Inspire's representations were true.

172. Inspire's false representations were in violation of Wyoming Statutes Chapter 12 (WS § 40-12-101 *et seq.*)

173. ABS suffered damages relying on Inspire's false representations, including, but not limited to, over $5 million in economic damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Auchea Business Solutions LLC respectfully requests that this Court enter a judgment and order in its favor and against Defendants for:

A. Compensatory damages of no less than six million dollars;

B. Consequential damages in an amount proven at trial;

C. An award of post-judgment interest;

D. Punitive damages;

E. An award of reasonable attorney's fees and costs incurred by Plaintiff in bringing this proceeding; and

F. Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Dated:  December 9, 2024

                LEWIS ROCA ROTHGERBER CHRISTIE LLP


                s/ *Chad S. Caby*
                Chad S. Caby, Bar No. 7-5457
                1601 19th Street, Suite 1000
                Denver, CO 80202
                Telephone: 303.623.9000
                Fax: 303.623.9222
                Email:  ccaby@lewisroca.com

                *Attorneys for Plaintiff*
                *Auchea Business Solutions*

STATE OF _Florida_    )
                      )ss.
COUNTY OF _Miami-Dade_  )


I, Javier Goicochea, have read the foregoing **Verified Complaint** and affirm that the matters set forth therein are true and correct to the best of my knowledge.

_____
Javier Goicochea

Subscribed before me this _6_ day of December, 2024.


Witness my hand and official seal:



_____
Notary Public

MARTHA OSPINA
Notary public - State of Florida
Commission # HH 193389
My Comm. Expires Nov 1, 2025
Bonded through National Notary Assn.